2022 IL App (1st) 210478

No. 1-21-0478

Filed June 23, 2022

Fourth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| CHARLES MUHAMMAD AND ANGIE MUHAMMAD, as Parents of C.M., a Minor; and C.M., Individually, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 19 L 6254 |
| | ) | |
| ABBOTT LABORATORIES, INC.; and ABBVIE INC., | ) ) ) | Honorable Brendan A. O'Brien, |
| Defendants-Appellees. | ) | Judge, Presiding |

JUSTICE MARTIN delivered the judgment of the court, with opinion
Presiding Justice Reyes and Justice Rochford concurred in the judgment and opinion

**OPINION**

¶ 1    In 2006, C.M. was born with the neural tube defect spina bifida. As he grew, he exhibited severe cognitive impairment and physical abnormalities. C.M.'s birth defects have been attributed to *in utero* exposure to Depakote, an anticonvulsant drug that his mother, Angie Muhammad, was prescribed to treat her mental illness. The Muhammads sued Angie's mental health physicians and their employer, Northwestern Memorial Hospital (Northwestern), alleging medical negligence for prescribing Depakote when Angie could become pregnant (the Northwestern case). Following a

jury trial, the Muhammads obtained a judgment of $18.5 million. Subsequently, the Muhammads brought an action against Depakote's manufacturer, Abbott Laboratories, Inc., and its related entities (collectively, Abbott), alleging that Abbott failed to sufficiently warn physicians regarding Depakote's risks of causing birth defects. Abbott moved for summary judgment arguing that the Muhammads should be judicially estopped from asserting this claim since, as Abbott contended, they took an inconsistent position in the prior Northwestern case. In addition, Abbott insisted the Muhammads cannot prove that Abbott caused C.M.'s injuries since, *inter alia*, the physicians testified in depositions that greater warnings would not have affected their decisions to prescribe Depakote. The circuit court granted Abbott's summary judgment motion, finding that the Muhammads were taking a position against Abbott contrary to their previous position in the Northwestern case. Based on that finding, the court concluded that judicial estoppel precluded the Muhammads' claim and that Abbott was entitled to judgment as a matter of law. The Muhammads appeal.

¶ 2                                    I. BACKGROUND

¶ 3        Angie Muhammad had a history of acute psychotic episodes and was hospitalized on several occasions as a result. In December 2003, Angie began receiving treatment at Northwestern's psychiatry department, known as the Rehabilitation Clinic of the Stone Institute of Psychiatry (Rehab Clinic). Angie was hospitalized four times between January and May 2005 with acute psychotic symptoms, including auditory hallucinations and suicidal and homicidal ideation (thoughts of killing herself, husband, and two young children).

¶ 4        Dr. Christian Stepansky, a second-year psychiatry resident at the Rehab Clinic, was part of Angie's treatment team and began seeing her every Tuesday to assess her symptoms and medication regimen. Angie's psychiatric condition was considered severe, complicated, and

difficult to treat. She was diagnosed with schizoaffective and bipolar disorders. She experienced "mixed episodes" of simultaneous manic and depressive symptoms and "rapid cycling"—frequent episodes of mania or depression. These symptoms were not controlled by Angie's antipsychotic medication, and she was at risk of harming herself or others unless her mood could be stabilized. Dr. Stepansky referred Angie to Dr. Pedro Dago for evaluation, in part to assess whether a language barrier was inhibiting Angie's care. Angie's first language was Spanish, and Dr. Dago was a Spanish speaking psychiatrist. After his evaluation on May 19, 2005, Dr. Dago recommended that Angie be prescribed either lithium or Depakote[1] to stabilize her mood.

¶ 5    Dr. Stepansky, under the supervision of attending psychiatrist Dr. Marcia Brontman, decided to recommend that Angie take Depakote. He reasoned that lithium was not a good option since lithium's therapeutic dosage is near the toxic dosage, which could result in death, and Angie had a history of suicidal ideation and a prior overdose attempt. He also ruled out another drug, Tegretol, since that drug was known to counteract birth control medication, which Angie was using, and she did not want to become pregnant. In addition, Depakote was more effective than the other drugs at controlling rapid cycling and mixed episodes.

¶ 6    Dr. Stepansky knew, however, that Depakote posed a risk of birth defects if taken during pregnancy, including that a child could be born with spina bifida. The 2005 edition of the Physician's Desk Reference (PDR) included a "black box" warning stating that Depakote can produce birth defects such as spina bifida if taken during pregnancy. In addition, the PDR entry for Depakote reported that Centers for Disease Control (CDC) data showed a 1% to 2% risk of a child being born with spina bifida if taken during the first trimester of pregnancy, up to 20 times the rate in the general population. The same information appeared on the insert Abbott included in

---

[1]Depakote is also known as valproate or valproic acid.

Depakote's packaging. Dr. Stepansky was aware of the PDR and insert warnings, but he did not recall reviewing either while he was treating Angie.

¶ 7        On May 24, 2005, Dr. Stepansky discussed his recommendation with Angie that she take Depakote. He informed her about the risk of birth defects if she were to become pregnant while taking it and advised that she not conceive because of that risk. At the time, Angie was using birth control medication that was administered by a patch affixed to her arm. Angie had some history of noncompliance with taking medication as directed, but unlike oral medication that must be taken daily, the patch was effective for several days before needing replacement. In addition, Dr. Stepansky and the nurse who participated in Angie's weekly appointments could monitor Angie's patch compliance. Since Angie stated she did not want to become pregnant and he believed her birth control could be managed, Dr. Stepansky reasoned that the benefit of Depakote to stabilize her mood outweighed the risk.

¶ 8        At her next appointment, on May 31, Angie informed Dr. Stepansky that her menstrual period was late. He ordered an immediate test that revealed she was not pregnant. Over the next few months, Dr. Stepansky increased the Depakote dosage to reach a tolerable therapeutic level. In July, Dr. Thomas Allen replaced Dr. Brontman as the attending psychiatrist supervising Dr. Stepansky. In an appointment on October 11, 2005, Angie again stated that she had missed her menstrual period. On this occasion, Angie refused to undergo an immediate pregnancy test but agreed to take one at home and report the result. Several days later, after an appointment with her psychologist, Angie requested that Dr. Stepansky order a pregnancy test at Northwestern. The laboratory confirmed that Angie was pregnant on October 20. That same day, Dr. Stepansky contacted Angie and instructed her to stop taking Depakote. Angie experienced another psychotic

episode in December. Dr. Stepansky then prescribed lithium to stabilize her mood. Angie continued to take lithium for the remainder of her pregnancy.

¶ 9        Angie likely became pregnant in early September 2005. Her son, C.M., was born in May 2006 with spina bifida. C.M. has severe cognitive impairment, his jaw and teeth are maldeveloped, and he suffers from other malformations. A neurologist, Dr. George Siegel, has opined that these medical issues were caused by his *in utero* exposure to Depakote during the early period of embryogenesis. These conditions are permanent.

¶ 10        The Muhammads first brought an action for medical negligence against Northwestern in 2012. Dr. Allen was named as a defendant, but Dr. Stepansky was not. The complaint alleged that:

"Depakote was well known within the medical and mental health communities as a drug that could cause serious, debilitating birth defects to a developing fetus, including the birth defect known as *Spina Bifida*, and was therefore well known within the same health care communities to be contraindicated for women who are or might become pregnant while using Depakote."

It further alleged that after Angie reported in May 2005 that she might be pregnant:

"Rather than discontinuing the Depakote, and despite knowledge of the well documented and widely accepted dangers associated with the use of Depakote *** the dosage of Depakote was between May and September 2005 increased rather than halted ***."

¶ 11        The Muhammads filed a separate action against Abbott in August 2017, alleging that Abbott failed to provide adequate warnings of Depakote's risk of birth defects. They voluntarily dismissed the Abbott case in June 2018 and the Northwestern case proceeded to a jury trial beginning in August 2018. Before trial, the Muhammads filed a motion *in limine* to bar the Northwestern defendants from eliciting any evidence that the Muhammads had filed a separate

action against Abbott. At the hearing on the motion *in limine*, the Muhammads' counsel explained that the Abbott complaint had been filed to preserve the Muhammads' ability to pursue a remedy against Abbott within the applicable statute of limitations. He added, "if *** we win this trial, then there would be no need to take further action." He went on to argue that any mention of the Muhammads' action against Abbott would be prejudicial and was otherwise irrelevant. He pointed out that the Northwestern physicians all acknowledged that they were aware that Depakote posed a risk of birth defects and none of them claimed that they would not have prescribed Depakote if they had more information. Defense counsel indicated that the issue could be relevant for purposes of cross-examining Dr. Siegel, one of the Muhammads' experts. The trial judge tentatively granted the motion *in limine* barring mention of the action filed against Abbott, but she informed the parties that they would revisit the issue before the cross-examination of Dr. Siegel to narrowly tailor the permissible questioning.[2]

¶ 12    In opening statements, the Muhammads' lawyer told the jury that their psychiatry expert, Dr. Cheryl Wills, would testify that Depakote was a "reasonable choice" for Angie when it was originally prescribed on May 24, provided that the physicians ensured that she was using reliable birth control. However, Dr. Wills would also testify that the balance of benefits versus risks of taking Depakote shifted on May 31 when Angie reported she might be pregnant. As counsel explained, Dr. Wills believed that based on the May 31 "pregnancy scare," the physicians should have realized that they needed to take Angie off Depakote. Coupled with other indicators that Angie could not be relied on to use the birth control patch correctly, the physicians could not

---

[2]The record before us does not include any further discussion of the issue from the Northwestern trial or show what ultimately occurred.

sufficiently ensure she would not get pregnant. On the stand, Dr. Wills testified that the physicians should have stopped prescribing Depakote on May 31.[3]

¶ 13       According to an instruction given to the jury, the Muhammads alleged that Northwestern and Dr. Allen negligently caused C.M.'s injuries by the following:

"(a) Failed to adequately monitor a second year resident's care and treatment of [a] complicated mentally ill patient; or

(b) Failed to put into place an adequate plan to prevent Angie Muhammad from getting pregnant while taking Depakote (valproic acid); or

(c) Failed to re-evaluate Angie Muhammad and her birth control plan when she reported that her menstrual period was late on May 31, 2005; or

(d) Failed to stop prescribing Depakote (valproic acid) on May 31, 2005 when Angie Muhammad reported that her menstrual period was late; or

(e) Failed to secure a pregnancy test on October 11, 2005 when Angie Muhammad reported that her menstrual period was late; or

(f) [F]ailed [to] direct Angie Muhmmad to stop taking Depakote (valproic acid) on October 2005 when she reported that her menstrual period was late."

The jury returned an $18.5 million verdict in favor of the Muhammads.[4]

¶ 14       The Abbott case was refiled in June 2019. The Abbott complaint asserts various causes of action, including strict product liability and negligence. All the claims share the common factual allegation that Abbott failed to adequately warn about Depakote's risks of birth defects.

---

[3]Abbott attached only this single question and answer from a transcript of Dr. Wills's trial testimony to its motion for summary judgment. The record here discloses nothing more about her testimony.

[4]Pursuant to a "high-low" agreement, Northwestern paid $12 million.

¶ 15　　　　According to an affidavit from psychiatrist Dr. Suhayl Joseph Nasr, documents produced in discovery in this case reveal that Abbott was made aware in 2004 of two new data sets suggesting a 10.7% to 17% risk of birth defects associated with Depakote use in women with epilepsy. Neither Dr. Nasr's affidavit nor the related supporting documents differentiate between spina bifida and other birth defects regarding this 10% to 17% risk. Nonetheless, researchers reported to Abbott that this rate of risk was "significantly higher than the package insert." Also in 2004, a separate study indicated that 8.1% of babies born to women taking Depakote had major malformations. The researchers of that study provided Abbott with a draft abstract stating their conclusion that "[Depakote] is a potent teratogen[5] in humans and its use should be reduced to the minimum or substituted with another safer [anticonvulsant drug]." Dr. Nasr asserts that if Abbott's labeling and warnings had disclosed a 10% to 17% risk of birth defects, a reasonably careful psychiatrist adhering to the standard of care would not have prescribed Depakote for Angie on May 24, 2005, or any later date. In Dr. Nasr's opinion, the 10% to 17% risk of birth defects— compared to the 1% to 2% risk of spina bifida or unquantified risks of other defects disclosed in the insert and PDR—significantly changes the risk-benefit analysis when considering Depakote for a patient like Angie, such that the risks outweighed the benefit. Additionally, Dr. Nasr believes lithium, which only carries a small risk of correctable heart defects, was a superior alternative for Angie. Ultimately, Dr. Nasr opines that if Abbott had disclosed Depakote's greater 10% to 17% risk of birth defects, C.M. would not have been born with spina bifida and other congenital defects.

¶ 16　　　　In a deposition taken in 2020, two years after the trial in the Northwestern case, Dr. Stepansky testified that, in 2005, he knew that Depakote posed an increased risk of spina bifida if taken when pregnant. Further, he knew that spina bifida was a serious condition that could lead to

_____

[5]An agent or factor which causes malformation of an embryo.

cognitive impairment and other developmental abnormalities. The reported 1% to 2% risk of spina bifida was "all [he] needed to know," according to Dr. Stepansky, whether to recommend that Angie take Depakote. He further explained that the insert and PDR warning was "enough for [him] to decide not to prescribe [Depakote] to a woman of child-bearing years unless she was using reliable birth control."

¶ 17     Similarly, Dr. Allen testified in a 2020 deposition that "birth control was a very critical factor *** in approving the prescription of Depakote in 2005." Had Angie not been using reliable birth control, he would not have approved the prescription as he did when supervising Dr. Stepansky. Like Dr. Stepansky, Dr. Allen attested that the 1% to 2% risk of spina bifida was enough information to not prescribe Depakote to any woman of child-bearing age who was not using birth control. But, so long as Angie was, the benefits outweighed the risks, in his opinion. If the reported risk of birth defects had been higher, according to Dr. Allen, it would not have changed his analysis. Rather, "it all depends on whether she's on birth control or not." Since he believed Angie needed Depakote to treat her bipolar disorder and she was taking precautions to not get pregnant, he would have still prescribed it "regardless of what the percentage of risk was," even "100%."

¶ 18     In his affidavit, Dr. Nasr states that Dr. Stepansky's and Dr. Allen's statements that they would have prescribed Depakote for Angie regardless of the level of risk is contrary to the standard of care. Rather, in his opinion, the 10% to 17% risk of birth defects revealed in the 2004 studies rendered Depakote unsafe for her and, had Abbott disclosed such risk, a reasonably careful psychiatrist would not have prescribed it for her.

¶ 19     As we noted, Abbott moved for summary judgment on two separate bases. First, Abbott argued that the Muhammads' claim premised on the failure to warn about Depakote's risk of birth

defects is inconsistent with the position they took against the physicians in the Northwestern case. Second, Abbott argued that the Muhammads cannot prove Abbott's failure to warn was the proximate cause of C.M.'s injury since, *inter alia*, Drs. Stepansky and Allen testified that greater warnings would not have made a difference in their decision to prescribe Depakote for Angie. The circuit court agreed with Abbott's first argument. In a written order, the court summarized the two cases as follows:

> "In the previous *Northwestern* case, Plaintiffs contended that the treating doctor should have stopped prescribing Depakote on May 31, 2005, when he learned it was possible Mrs. Muhammad was pregnant because the doctors knew of the birth risks associated with Depakote. In this *Abbott* case, Plaintiffs argue that Mrs. Muhammad should never have been given Depakote at all because the doctors did not know of the risks."

The court found these theories inconsistent by reasoning that:

> "The jury in the *Northwestern* case presumably accepted that the doctors knew or should have known of Depakote's birth risks and returned a verdict in Plaintiffs' favor based on the doctors negligently prescribing it when they suspected she was pregnant. Plaintiffs now allege that Defendants failed to warn the doctors regarding the birth risks associated with the use of the drug. If Plaintiffs succeed here in *Abbott* and prove that Defendants failed to warn the doctors, then this would be contrary to the previous position and verdict that found the doctors failed to conform their treatment to the applicable standard of care based on their knowledge of Depakote's birth risks."

Based on its finding, the circuit court concluded that Abbott proved by clear and convincing evidence that judicial estoppel applied and granted Abbott's summary judgment motion. The court did not address Abbott's alternative argument. The Muhammads filed a timely notice of appeal.

¶ 20 II. ANALYSIS

¶ 21 A. Standard for Summary Judgment

¶ 22 Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 25. We review a circuit court's entry of summary judgment *de novo*. *Jarosz v. Buona Cos.*, 2022 IL App (1st) 210181, ¶ 29. *De novo* review means we consider the motion anew and perform the same analysis that a trial court would. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). We may affirm summary judgment where the pleadings, depositions, affidavits, and admissions on file establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Jarosz*, 2022 IL App (1st) 210181, ¶ 22. However, we construe the record strictly against the movant and liberally in favor of the nonmoving party, drawing all reasonable inferences in favor of the nonmovant. *Shuttlesworth v. City of Chicago*, 377 Ill. App. 3d 360, 366 (2007). Since summary judgment is a drastic measure, it should only be granted if the movant's right to judgment is clear and free from doubt. *Seymour v. Collins*, 2015 IL 118432, ¶ 42.

¶ 23 B. Principles of Judicial Estoppel

¶ 24 Judicial estoppel is an equitable doctrine that may be invoked when a litigant took a position in one judicial proceeding, benefited from that position, and then seeks to assert a contrary position in a later proceeding. *Id.* ¶ 36. The doctrine aims to "protect the integrity of the judicial process by prohibiting a party from 'deliberately changing positions' according to the exigencies of the moment." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)). It "is intended to promote truth-seeking, while dissuading gamesmanship." *Davis v. Pace Suburban Bus Division of the Regional Transportation Authority*, 2021 IL App (1st) 200519, ¶ 27. "The core

concern is *** that a party takes factually inconsistent positions, in separate proceedings, intending that the trier of fact accept the truth of the facts alleged." *Seymour*, 2015 IL 118432, ¶ 38. The party seeking to invoke judicial estoppel must prove it by clear and convincing evidence. *Id.* ¶ 39.

¶ 25     Five prerequisites are "generally required" before a court can invoke judicial estoppel: "The party to be estopped must have (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it." *Id.* ¶ 37.

¶ 26     Yet, even if the prerequisites are met, judicial estoppel should be considered and applied with caution to avoid impinging on the truth-seeking function of the court. *Id.* ¶ 39. It is an extraordinary measure and must be carefully confined to its anti-hoodwinking purpose. *Ceres Terminals, Inc. v. Chicago City Bank & Trust Co.*, 259 Ill. App. 3d 836, 850 (1994). Judicial estoppel is intended to address bad faith—playing " 'fast and loose' " with the court. *People v. Runge*, 234 Ill. 2d 68, 133 (2009) (quoting *People v. Caballero*, 206 Ill. 2d 65, 80 (2002)). A change in theory does not necessarily indicate that a party is acting in bad faith. Indeed, a change of position in response to new, previously unavailable evidence is "consistent with the court's truthfinding role" and does not trigger judicial estoppel. (Internal quotation marks omitted.) *Id.*

¶ 27     For these reasons, a court's inquiry is not complete once it finds the prerequisite factors of judicial estoppel are met. Rather, the court must next determine, in its discretion, whether judicial estoppel should be invoked " 'as fairness and justice require.' " *Davis*, 2021 IL App (1st) 200519, ¶ 73 (quoting *Yorulmazoglu v. Lake Forest Hospital*, 359 Ill. App. 3d 554, 563 (2005)). If the court finds that that party did not intend to be deceptive, or if the court believes that applying the doctrine would lead to unwarranted or unjust results, the court need not invoke it. *Id.* ¶ 29.

¶ 28                    C. Are the Muhammads' Positions Inconsistent?

¶ 29        Abbott argues that the Muhammads' claims in this case are factually inconsistent with the position they took in the Northwestern case. Abbott posits that the plaintiffs "revised the relevant factual underpinnings and their causation theories in successive suits to obtain an unfair advantage." In its summary judgment motion, Abbott asserted that the "basic premise" of the Muhammads' position in the Northwestern case was that the physicians "had all the information they needed to prescribe the medicine safely, but failed to utilize that knowledge in accord with the standard of care." Abbott noted that the Muhammads' complaint against Northwestern alleged that it was "well known within the medical and mental healthcare communities" that Depakote could cause birth defects. And they alleged the physicians failed to discontinue it "despite knowledge of the well documented and widely accepted dangers associated with the use of Depakote." But, Abbott insisted, the Muhammads were now blaming Abbott for inadequate warnings about the "same risks" that they previously alleged to be widely known. In its brief before this court, Abbott avers that in the Northwestern case, the plaintiffs "argued that the substandard treating decisions of Mrs. Muhammad's physicians were the *sole* cause of her alleged injuries." (Emphasis in original.) Abbott further contends that "[t]o support their position, Plaintiffs argued *** that no additional information from Abbott would have made a difference because the defendant physicians still would have made the same prescribing decision."

¶ 30        Based on the record before us, we disagree with Abbott's characterization of the Muhammads' positions. Rather, we find that the Muhammads' positions in the separate cases are compatible. *Cf. id.* ¶ 42 (finding judicial estoppel applied when "plaintiff was taking fundamentally incompatible positions in each case"). That is, the acceptance of the facts alleged in the Northwestern case as true does not necessarily preclude the truth of the Muhammads' factual

allegations against Abbott. See *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 68 ("For judicial estoppel to apply, the two positions must be totally inconsistent—the truth of one must necessarily preclude the truth of the other.").

¶ 31      Courts recognize that there can be more than one proximate cause of a plaintiff's injury. *Shicheng Guo v. Kamal*, 2020 IL App (1st) 190090, ¶ 23. Any actor whose negligence proximately causes an injury in whole or in part is liable to the plaintiff. *Davis*, 2021 IL App (1st) 200519, ¶ 50.

¶ 32      Abbott's alleged failure to provide sufficient warnings about Depakote's risk of birth defects and the physicians' failure to cease prescribing Depakote to Angie once it became apparent her birth control measures were unreliable could both be found to be proximate causes of C.M.'s injuries. According to Dr. Nasr, if Abbott had disclosed the 10% to 17% risk of birth defects, which was greater than the warning information stated in the insert, physicians adhering to the standard of care would not have prescribed Depakote for Angie at any time. Dr. Nasr's opinion implies a corollary that the inadequate warning led the physicians to believe that Angie could safely take Depakote subject to reliable birth control measures. Notably, that is the standard of care that Dr. Wills appears to have testified was applicable in the Northwestern trial. The standard of care is based on information known at the time of a physician's action. *Granberry v. Carbondale Clinic, S.C.*, 285 Ill. App. 3d 54, 65 (1996) ("no physician should have his *conduct* measured by knowledge and standards not in existence at the time the conduct at issue occurred" (emphasis in original)); see also *Smith v. Silver Cross Hospital*, 339 Ill. App. 3d 67, 76-77 (2003) (finding that policies and procedures adopted after the time of treatment at issue were irrelevant to establish the applicable standard of care). The Muhammads alleged, and the Northwestern case jury necessarily accepted, that the physicians did not meet the standard of care by continuing to prescribe Depakote to Angie when they should have realized her birth control was unreliable. Their negligence was

not predicated so much on the extent of their knowledge that Depakote could cause birth defects, but on their misjudgment about Angie's ability to use effective birth control measures. The jury instruction outlining the Muhammads' negligence allegations, focused on the continuation of Depakote rather than its initial prescription, underscores this point. That the physicians had, in Abbott's words, "all they needed to know to *discontinue* Depakote" does not preclude that they lacked sufficient information to not start Angie on Depakote to begin with. (Emphasis added.)

¶ 33        Despite the physicians' negligence, Abbott's allegedly deficient warning could still be found to be a proximate cause of C.M.'s injury. A plaintiff asserting a claim based on a drug maker's failure to warn must establish that the failure to warn caused the injury. *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222, 266 (1990). A defendant's conduct is a cause of the plaintiff's injury "only if that conduct is a material element and a substantial factor in bringing about the injury." *Abrams v. City of Chicago*, 211 Ill. 2d 251, 258 (2004). This standard is met when, "absent that conduct, the injury would not have occurred." *Id.* If a finder of fact were to accept Dr. Nasr's opinion that physicians would never have prescribed Depakote to Angie if there had been sufficient warnings, then, but for the deficient warning, the physicians' later negligence would not have occurred and C.M. would not have been injured by exposure to Depakote. "[P]roximate cause 'need not be the only, last or nearest cause; it is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes injury.' " *Garest v. Booth*, 2014 IL App (1st) 121845, ¶ 41 (quoting *Leone v. City of Chicago*, 235 Ill. App. 3d 595, 603 (1992)). "[A] tortfeasor cannot avoid responsibility merely because another person is guilty of negligence contributing to the same injury, and even though the injury would not have occurred but for the negligence of the other person." *Unger v. Eichleay Corp.*, 244 Ill. App. 3d 445, 452 (1993). This court has recognized that a prescribing physician's malpractice does not necessarily relieve a drug manufacturer from

liability for failure to provide adequate warnings of a drug's risks. *Mahr v. G.D. Searle & Co.*, 72 Ill. App. 3d 540, 566 (1979). Accordingly, the Muhammads' theories of liability against Abbott and Northwestern are compatible. The facts asserted to establish either the physicians' or the drug maker's liability do not necessarily preclude the others' liability.

¶ 34    The alleged facts discussed in *Davis* provide an analogy. There, a bus passenger sustained injuries when the bus driver braked suddenly to avoid colliding with a Lexus sedan that had pulled into the bus's path from a parking lot. *Davis*, 2021 IL App (1st) 200519, ¶ 6. The plaintiff filed an action seeking a declaratory judgment against his auto insurer on the theory that the unidentified Lexus was a " 'hit-and-run' " vehicle, thus triggering coverage under the uninsured motorist provision of plaintiff's policy (the coverage case). *Id.* ¶ 10. The circuit court ultimately agreed with the plaintiff and found he was entitled to coverage under that provision. *Id.* ¶ 14. Within the coverage case, the court found that the Lexus driver's negligence in pulling into the bus's path was a proximate cause of the plaintiff's injuries " 'because [the Lexus] caused the bus driver to take actions that then caused the plaintiff to fall.' " *Id.* ¶ 13. Separately, the plaintiff sued the bus company alleging that the bus driver was negligent for speeding and slamming on the brakes instead of gradually slowing to avoid the Lexus. *Id.* ¶¶ 17, 19. This court observed that since there can be more than one proximate cause of a plaintiff's injury, "[t]here would be nothing inconsistent *** with plaintiff claiming that the negligence of the Lexus driver was a proximate cause of his injuries *** and that the negligence of the [bus driver] was a proximate cause of his injuries." *Id.* ¶ 50. Here, by analogy, Abbott is like the Lexus driver and the physicians are like the bus driver. In both cases, it is consistent to claim that the later actor's conduct caused the injury, and such conduct would not have occurred but for the initial actor's conduct, which is also a cause of the injury.

¶ 35        Although the plaintiff in *Davis* was judicially estopped, judicial estoppel did not apply on account of the theories he asserted for each defendant's liability. The court found judicial estoppel appropriate since, after winning the coverage case, his expert witness testified in a deposition that the bus driver's negligence was the *sole* proximate cause of his injuries rather than *a* proximate cause along with the Lexus driver's negligence. *Id.* ¶ 51. Through the expert's opinion, his position "morphed" between the coverage case and the tort case against the bus company. *Id.* ¶ 53. Nothing similar has occurred here. Contrary to Abbott's assertion, we do not find that the Muhammads, through their experts or otherwise, have claimed that either the physicians or Abbott is solely to blame for C.M.'s injuries. As we have explained, Dr. Wills's opinion that the physicians caused C.M.'s injury by keeping Angie on Depakote when the unreliability of her birth control was apparent does not preclude Dr. Nasr's opinion that Abbott's failure to warn caused C.M.'s injuries since a greater warning would have led the physicians to not prescribe her Depakote at all.

¶ 36        At first glance, Dr. Wills's testimony that Depakote was initially a "reasonable choice" for Angie appears to contradict Dr. Nasr's opinion that Angie should have never been prescribed Depakote at all. However, we are not persuaded that this apparent inconsistency compels us to invoke judicial estoppel. First, we do not know whether Dr. Wills testified that it was reasonable to start Angie on Depakote. Abbott's only supporting evidence is counsel's opening statement indicating how she would testify, not her actual testimony. It is not unheard of for testimony to fail to match what was promised in an opening statement. Apart from that, Dr. Nasr indicated that his opinion was based on information obtained in discovery in the Abbott case. The record does not establish that Dr. Wills was privy to the same information. We cannot presume that Dr. Wills considered the same information or that her "reasonable choice" testimony, if she so testified, necessarily implied that she believed the additional information Dr. Nasr discusses has no effect

on prescribing decisions. Thus, Abbott has not shown by clear and convincing evidence that the experts based their opinions on the "same risks." More significant, the initial prescription of Depakote does not appear to have been the focus of Dr. Wills's testimony. She opined that the physicians failed to meet the standard of care by continuing Angie on Depakote when her birth control was unreliable. The record before us shows that Dr. Wills's testimony merely concerned the physicians' conduct based on what was known about Depakote at that time. Dr. Nasr's opinion regards other, undisclosed information about Depakote. The experts simply address different matters.

¶ 37    In addition, even if we were to consider Dr. Wills's and Dr. Nasr's opinions to be contradictory, we cannot foreclose the possibility that the difference reflects the discovery of new evidence justifying a change in theory. A change of position in response to new, previously unavailable evidence is "consistent with the court's truthfinding role" and does not trigger judicial estoppel. (Internal quotation marks omitted.) *Runge*, 234 Ill. 2d at 133. As mentioned, additional undisclosed evidence about Depakote's risk of birth defects came to light during discovery in this case, and the record does not demonstrate the experts were considering the same information.

¶ 38    Further, we reject Abbott's contention that the Muhammads' position in the Northwestern case included that "no additional information from Abbott would have made a difference because the defendant physicians still would have made the same prescribing decision." For that proposition, Abbott relies on statements the Muhammads' counsel made to support their motion *in limine* to bar mention of their separate suit against Abbott. Such statements, of course, were made to the judge, not the jury. While any part of the trial record may provide some indicia of a party's position, judicial estoppel is ultimately concerned with factual allegations that a party intends for the finder of fact to accept as true. *Seymour*, 2015 IL 118432, ¶ 38. By themselves,

arguments advanced to the judge in a motion *in limine* before a jury trial are not factual allegations intended for the finder of fact—the jury—to accept as true. Abbott has not directed us to any part of the record in the Northwestern case apart from the motion *in limine* hearing to demonstrate that the Muhammads presented arguments or evidence to the jury that the physicians "still would have made the same prescribing decision." In addition, the Muhammads' counsel did not actually state nor imply such a thing. Rather, he argued that evidence about the separate suit was prejudicial and irrelevant since none of the *physicians* were claiming that they would have acted differently had Abbott provided more information. In other words, he was pointing out that the physicians were not asserting, as a defense to their alleged negligence, that Abbott failed to adequately warn them. Thus, the statements do not signify anything about what the *Muhammads* were claiming. "The physicians are *not* saying so" does not equate to "we *are* saying so."

¶ 39        Similarly, the Muhammads' counsel's statement "if *** we win this trial, then there would be no need to take further action" does not compel us to invoke judicial estoppel. This statement, too, was made to the judge in argument on the motion *in limine* and not to the jury to accept as true. Also, it is a legal opinion and not a statement of fact. Judicial estoppel applies to statements of fact, not to legal opinions or conclusions. *Pepper Construction Co.*, 2016 IL App (1st) 142754, ¶ 66. Like the other statements made by counsel, it may provide some indicia of the Muhammads' position, but Abbott has not provided clear and convincing evidence that the Muhammads alleged facts in the trial of the Northwestern case that were inconsistent with their position in this case such that the judgment in their favor bars "further action" against Abbott.

¶ 40        In sum, the Muhammads did not simply flip-flop from "the doctors were sufficiently warned" to "the doctors were not sufficiently warned." The Northwestern case claimed the physicians' negligence regarding Angie's birth control while on Depakote was a cause of C.M.'s

injuries, while this case claims that Abbott's insufficient warning of Depakote's risks of birth defects was another cause of C.M.'s injuries. The Muhammads have not alleged expressly or implicitly in either action that any defendant was solely responsible for C.M.'s injuries, and their experts' opinions can be reconciled as consistent with one another. We find that Abbott has failed to show by clear and convincing evidence that the Muhammads are taking a position in this case inconsistent with their position in the Northwestern case. Accordingly, we decline to invoke judicial estoppel to bar this action.

¶ 41                                    D. Proximate Cause

¶ 42         Separate from its argument based on judicial estoppel, Abbott contends that the Muhammads cannot prove Abbott's alleged failure to warn is a proximate cause of C.M.'s injury and, therefore, Abbott is entitled to judgment as a matter of law.

¶ 43         In part, Abbott relies on the "learned intermediary" doctrine, which holds that "[t]he doctor, functioning as a learned intermediary between the prescription drug manufacturer and the patient, decides which available drug best fits the patient's needs and chooses which facts from the various warnings should be conveyed to the patient." *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 519 (1987). Since physicians function as learned intermediaries, "there is no duty on the part of manufacturers of prescription drugs to directly warn patients." *Id.* Rather, "manufacturers of prescription drugs have a duty to warn prescribing physicians of the drugs' known dangerous propensities." *Id.* at 517. Adequate warnings of a drug's risks and side effects shield the manufacturer from liability if a patient suffers from those effects while taking the drug. *Sellers v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 881 F. Supp. 2d 992, 1005 (S.D. Ill. 2012) (citing *Kirk*, 117 Ill. 2d 507). At the same time, "there is no duty to warn of a risk that is already known by those to be warned." *Proctor v. Davis*, 291 Ill. App. 3d 265, 277 (1997). So, "a drug

manufacturer need not provide a warning of risks known to the medical community." *Id.* But, " '[d]octors who have not been *sufficiently* warned of the harmful effects of a drug cannot be considered "learned intermediaries." ' " (Emphasis in original.) *Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420, 432 (2002) (quoting *Proctor*, 291 Ill. App. 3d at 283).

¶ 44    Thus, to establish a drug manufacturer's liability, a plaintiff must show the drug manufacturer's warning was inadequate and the risk was not widely known in the medical community. *Sellers*, 881 F. Supp. 2d at 1006 (citing *Hansen*, 198 Ill. 2d at 432, *Proctor*, 291 Ill. App. 3d at 280, and *Tongate v. Wyeth Laboratories*, 220 Ill. App. 3d 952, 963 (1991)). The adequacy of warnings is generally a question of fact. *Proctor*, 291 Ill. App. 3d at 283. Expert testimony is required to establish that a warning is inadequate unless a lay person could readily understand the insufficiency of the warning. *Northern Trust Co. v. Upjohn Co.*, 213 Ill. App. 3d 390, 399 (1991).

¶ 45    Abbott argues that the Muhammads cannot show that its warning was inadequate or that Depakote's risks of birth defects were not widely known in the medical community, contending that they have not produced evidence to support either proposition. Moreover, Abbott contends that the record establishes the opposite since the physicians testified that they were aware that Depakote could cause birth defects and such risks were stated in the package insert and PDR. We disagree. Though the record demonstrates that in 2005 the insert and PDR reported a 1% to 2% risk of spina bifida and noted unquantified risks of other birth defects, Dr. Nasr's affidavit and referenced documentation reveal that Abbott had been made aware of risks "significantly higher than the package insert" in 2004. Dr. Stepansky and Dr. Allen testified that they were aware of the insert and PDR warning information. Neither physician stated that he was aware of the higher risks that Dr. Nasr's affidavit references. Furthermore, Dr. Nasr attests that this information makes a

difference: it changes the benefit versus risk analysis for doctors considering Depakote for a woman of childbearing age. For Angie, he opines that physicians adhering to the standard of care would not have prescribed Depakote at all if the higher risks had been disclosed in the warnings. The affidavit and accompanying documents also indicate that Abbott made researchers change their abstract title and conclusion to sound less alarming. Thus, Dr. Nasr's affidavit necessarily implies that the warning was inadequate due to a consequential difference in the risks Abbott was aware of and the risks Abbott disclosed. His affidavit further implies that the greater risks were not widely known within the medical community. Accordingly, we find that a genuine question of fact exists on these issues.

¶ 46    Next, Abbott argues that the Muhammads cannot prove its alleged failure to warn was a proximate cause of C.M.'s injuries since Drs. Stepansky and Allen both testified that they would not have acted differently if they had been informed that Depakote posed a greater risk of birth defects. Illinois courts have reasoned that a physician's testimony that " 'I would not have done anything differently' [if I had been provided additional information]" should not be given dispositive weight when, as in this case, the opposing party presents conflicting expert testimony that such conduct would not conform to the standard of care. See *Buck v. Charletta*, 2013 IL App (1st) 122144, ¶¶ 69, 71; *Shicheng Guo*, 2020 IL App (1st) 190090, ¶¶ 33-34. The resolution of the conflict in testimony "involves factual findings and credibility determinations that should be left to the jury." *Shicheng Guo*, 2020 IL App (1st) 190090, ¶ 34.

¶ 47    Abbott argues that *Buck* and *Shicheng Guo* are inapposite since those were medical malpractice cases, and this case concerns a drug manufacturer's alleged failure to warn. While that distinction is accurate, it makes no difference. Just as in *Buck* and *Shicheng Guo*, the physicians' testimony and an expert's opinion differ on a material issue. Whether the physicians would have

prescribed Depakote if Abbott had disclosed risks "significantly higher than the package insert" bears directly on whether Abbott's alleged failure to warn was a proximate cause of C.M.'s injuries. To prevail, the Muhammads must establish that greater warnings would have prevented C.M.'s injuries; that is, whether greater warnings would have led the physicians to make different prescribing decisions such that C.M. would not have been exposed to Depakote. See *Northern Trust Co.*, 213 Ill. App. 3d at 401; *Broussard v. Houdaille Industries, Inc.*, 183 Ill. App. 3d 739, 744 (1989). Dr. Nasr's affidavit and the depositions of Drs. Stepansky and Allen present conflicting evidence on this question. A trial is the proper mechanism for resolution.

¶ 48                                    III. CONCLUSION

¶ 49        For these reasons, we find that judicial estoppel does not apply, genuine issues of material fact exist as to proximate cause, and Abbott is not entitled to judgment as a matter of law. Accordingly, we reverse the judgment of the circuit court granting Abbott summary judgment and remand for further proceedings.

¶ 50        Reversed and remanded.

---

2022 IL App (1st) 210478

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-L-6254; the Hon. Brendan A. O'Brien, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Milo W. Lundblad, of Brustin & Lundblad, Ltd., of Chicago, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Lauren J. Caisman, of Bryan Cave Leighton Paisner LLP, of Chicago, and Dan H. Ball and Stefani L. Wittenauer, of Bryan Cave Leighton Paisner LLP, of St. Louis, Missouri, for appellees. |

---