2024 IL App (1st) 230104-U
No. 1-23-0104

FIRST DIVISION
August 5, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 04 CR 5493 |
| THOMAS WALKER, | ) | |
| Defendant-Appellant. | ) | The Honorable Carol M. Howard, Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held:* Defendant did not substantially show that appellate counsel provided ineffective assistance for failing to argue that the circuit court erred by refusing defendant's request to instruct the jury on involuntary manslaughter. Moreover, there is no reason to remand this case for further proceedings since defendant failed to make that substantial showing.

¶ 2    Defendant Thomas Walker ("Defendant") appeals the second-stage dismissal of his *pro se* petition for postconviction relief. Defendant argues that his petition made a substantial showing that appellate counsel provided ineffective assistance since counsel failed to argue that the circuit court erred by refusing defendant's request to instruct the jury on involuntary

manslaughter. In the alternative, defendant argues that we should remand his petition for a third-stage evidentiary hearing since the State did not move to dismiss his claim regarding the involuntary manslaughter instructions. We affirm.

¶ 3                                    BACKGROUND

¶ 4        On March 5, 2004, a grand jury indicted defendant on eight counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2004)) for shooting and killing Juliette Robinson ("Juliette"). The case proceeded to a jury trial.

¶ 5        The following evidence was presented at trial. Defendant's son Thomas Walker III ("Thomas") testified that he lived at 8821 South Princeton, Chicago, Illinois, and was eleven years old in February 2004. Thomas lived with his mother, Juliette, his father, defendant, and his older sister, Dionne Robinson ("Dionne"). Thomas described the layout of the house. The front door area opened into the living room through which Juliette's bedroom was located. Thomas and Dionne's bedrooms were upstairs. Defendant lived in the basement.

¶ 6        In the evening of February 4, 2004, Thomas went to sleep in Juliette's bedroom with her. Defendant came into the bedroom asking for underwear and pulled out a firearm. He and Juliette started arguing. Defendant accused Juliette of sleeping with another man. He called Dionne into the bedroom and told her to bind Thomas, but she refused. Defendant then reached behind the bedstand to retrieve a tape recorder. Juliette got out of bed and ran out of the bedroom and to the front door. Defendant fired two shots and stood in the bedroom doorway. Thomas testified that he thought defendant fired another shot.

¶ 7        Defendant moved out of the bedroom doorway and went to the front door. Thomas ran outside and saw Juliette lying at the bottom of the stairs outside the front door. Defendant got into his white van and drove away. Dionne called the police while Thomas stayed with Juliette.

¶ 8        Dionne testified that in February 2004, she lived at 8821 South Princeton with Juliette, Thomas, and her stepfather, defendant. On February 4, 2004, at approximately 11:30 p.m., Dionne was upstairs in her room on a cell phone. Defendant yelled for her to come downstairs. Dionne went downstairs and saw defendant in the doorway of Juliette's bedroom waving her into the room with a firearm in his hand. In the bedroom. Juliette and Thomas were sitting on the bed. Dionne asked defendant what was happening. Defendant responded that he planned to kill someone in the bedroom that night. Defendant threw duct tape at Dionne and told her to tie up her brother which she refused to do.

¶ 9        Juliette tried to calm defendant down and asked him to put the firearm away.  Defendant refused to put the gun away and instead went to grab the tape recorder from behind the bed. Juliette ran outside the bedroom door and defendant shot at her twice from inside the bedroom. Juliette was already outside the bedroom door when defendant started shooting. Defendant dropped the tape recorder in the bedroom. Defendant followed Juliette and fired two more shots at her from the living room. Dionne testified that she heard defendant fire two more shots. Dionne did not see defendant fire the two final shots but guessed that he fired them at Juliette as she went through the front door.

¶ 10       Thomas followed Juliette and defendant out of the bedroom. Dionne remained in the bedroom and called the police on the home phone. She then went outside to check on her mother and passed Thomas as he came back inside the house. Dionne saw defendant get in his van and drive away.

¶ 11       Dionne identified the tape recorder that defendant pulled from behind the bed. She testified that she listened to the recording and that it truly and accurately depicted what happened on the evening of February 4, 2004. The State sought to admit the tape recorder into evidence.

The circuit court admitted the tape recorder into evidence and the recording was played for the jury.

¶ 12     In the recording, Juliette denies defendant's allegations of cheating and attempts to calm him down. Juliette states, "put the gun down" and "put the gun away and then we're going to calm down." Defendant tells her to "shut the f*** up." He also tells Dionne to "take the tape and tie him up." Dionne refuses and defendant states, "I'm fitting to kill a motherf***er in this house today."

¶ 13     Alberta Randall testified that she lived at 8826 South Princeton Avenue, Chicago, Illinois, in February 2004. In the evening of February 4, 2004, she heard arguing coming from across the street at 8821 South Princeton Avenue where Juliette and defendant lived. Randall then heard a "pow" sound and saw Juliette fall down her house's front porch stairs across the street. Defendant ran down the stairs, got into his van, and drove away. Randall called the police and ran across the street to check on Juliette. Randall covered Juliette with a blanket.

¶ 14     Officer Kathleen Gahagan testified that she worked as an evidence technician for nine years and as a forensic investigator for eight years in the forensic services division of the Chicago Police Department. Her division processes crime scenes by documenting, collecting, and analyzing physical evidence. On February 5, 2004, slightly after midnight, Gahagan received a call to investigate a homicide at 8821 South Princeton.

¶ 15     From the outside of 8821 South Princeton, Gahagan identified bullet holes in the front paneling of the house perpendicular to the front door. She identified two more bullet holes in the front door. Inside the foyer, she identified bullet holes corresponding to the ones found in the front paneling. Outside the bedroom door, she identified a bullet hole. She testified that the bullet went through the door jamb and into the wall outside the bedroom. She did not locate any bullet

casings which indicated to her that a revolver was used. Gahagan explained that when a revolver is fired, the casings remain in the cylinder. In contrast, when a semi-automatic firearm is fired, the casing is ejected and would end up somewhere on the floor.

¶ 16    Detective Mark Pacelli testified that on the evening of February 6, 2004, he learned that defendant had attempted to commit suicide and was being treated at a hospital. When Pacelli arrived at the hospital, officers were already guarding defendant's room since there was already an existing arrest warrant issued for defendant for the death of Juliette.

¶ 17    Doctor Mitra Kalelkar testified that she performed an autopsy on Juliette. Juliette had a gunshot wound to her back, drag abrasions on the left side of her face, and an upper lip laceration. Kalelkar determined that the bullet entered through Juliette's back, went through her ninth thoracic vertebra, lacerated the aorta, and then went through her heart. Kalelkar recovered the bullet from Juliette's left breast. The bullet traveled from back to front, right to left, and upward. Juliette died from a gunshot wound to her back and the manner of death was homicide. The State rested.

¶ 18    Defendant testified in his defense. In February 2004, he lived at 8821 South Princeton. His and Juliette's relationship was "going through some ups and downs." He thought that she was cheating on him. On February 4, 2004, Juliette started recording his calls. In retaliation, defendant put a tape recorder behind their bed. He hoped to record her talking to a friend about the cheating.

¶ 19    Later, defendant went to their bedroom to discuss with Juliette their relationship. She was in their bed with their son Thomas. She started yelling at him. He grabbed her firearm, which was already cocked, from the dresser. He attempted to retrieve the tape recorder from behind the bed, and Juliette jumped up and pushed his hand, causing the firearm to discharge. Defendant

testified "she ran past and pushed the gun. And when it came back, I think it shot her. I don't know. I mean, I can't remember all of it." Defense counsel asked "[a]nd what happened after that ***?" Defendant answered "I really can't tell you. I don't remember none of it."

¶ 20      On cross-examination, defendant stated that he grabbed the firearm because Juliette reached for at first and he noticed that the firearm was cocked. Additionally, the State and defendant discussed the following:

> "Q. And then you say that she brushed past you and the gun went off?
> A. No, I said she ran past and pushed my hand.
> Q. And that caused the gun to go off that first time?
> A. I don't know. I know the trigger was cocked. I don't know what caused the gun to go off."
> Q. I'm sorry, I can't hear you.
> A. I just remember the trigger was cocked. I don't know what caused the gun to go off.
> * * *
> Q. You can't remember. After you got that digital recorder, that's when you say [Robbinson] like hit you as she ran past you?
> A. Yes, ma'am.
> Q. And you say the gun went off?
> A. Yes, ma'am.
> * * *
> Q. The gun that you say you took from [Juliette's] room, is that gun a revolver?
> A. I guess so."

The defense did not call any other witnesses.

¶ 21      Following the close of evidence, defense counsel requested that the jury be instructed on second degree murder. The circuit court denied the request and stated:

> "I don't think you can get second degree by saying it accidentally went off and I don't remember, therefore, I should get second degree. No. If it's an accident, he can argue what he testified to that it was an accident. I don't think you can get second degree as to an involuntary. The lawyers didn't say—"

Based on the court's comments, defense counsel requested an instruction of involuntary manslaughter. The court denied the request and stated:

"His testimony was not reckless. He didn't say that he cocked it. He said that it was already that way when he got it in his hand. And that she then brushed by him. What did he do reckless[ly]? He took the gun out of the [dresser], which he said it was already cocked. He did not recklessly have a loaded gun in a firing position in the [dresser]. He is the person, according to his testimony, who got the gun out of the [dresser] to keep it away from her. Then she, in the course of when she runs hits the gun according to his testimony, that gun accidentally goes off. Not recklessly. I didn't pull the trigger. I didn't fire a warning shot that accidentally hit her. Nothing. It accidentally went off. He did not cock the gun. He did nothing, which argument would be from his testimony reckless."

The court also noted that the State's evidence established an entirely different scenario involving defendant discharging multiple shots at various times.

¶ 22      The jury found defendant guilty of first degree murder and that he personally discharged a firearm which proximately caused the death of Juliette. Defense counsel filed a motion for new trial where he argued that the circuit court erred in failing to instruct the jury on involuntary manslaughter. The circuit court sentenced defendant to a total term of 65 years in prison, consisting of 40 years for first degree murder and 25 years for a personal-discharge enhancement.

¶ 23      Defendant appealed. On direct appeal, we affirmed defendant's conviction and sentence but corrected the mittimus to reflect a single conviction for murder. *People v. Walker*, 403 Ill. App. 3d 68, 81 (1st Dist. 2010). In a supervisory order, our supreme court directed us to vacated our judgment and reconsider it in light of *People v. Thompson*, 238 Ill. 2d 598 (2010). We again affirmed defendant's conviction and sentence but corrected the mittimus to reflect a single conviction for murder. *People v. Walker*, 2011 IL App (1st) 072889-B, ¶ 41-42. Defendant did not raise the issue of the involuntary manslaughter instruction on direct appeal.

¶ 24      On September 6, 2012, defendant filed a *pro se* postconviction petition. He alleged that appellate counsel provided ineffective assistance for failing to argue that the circuit court erred in failing to instruct the jury of his "requested jury instructions." His petition stated, "[he] never

denied that he shot Juliette, in fact the evidence and his testimony demonstrated [a] reckless act." His petition advanced to the second stage of postconviction proceedings and the circuit court appointed to counsel. Postconviction counsel filed a Supreme Court Rule 651(c) certificate and did not amend defendant's petition. The State filed a motion to defendant's postconviction petition. In their motion, the State argued that "the [circuit] court did not improperly refuse [defendant's] jury instruction" and directly quoted defendant's argument that "his testimony demonstrated [a] reckless act." Still, the State's motion to dismiss focused its argument on the second degree murder instruction.

¶ 25    The circuit court granted the State's motion to dismiss defendant's postconviction petition. The circuit court did not address the involuntary manslaughter instruction in its reasoning. Defendant appealed.

¶ 26                                     ANALYSIS

¶ 27                    A. Ineffective Assistance of Appellate Counsel

¶ 28    Defendant first argues that his petition made a substantial showing that appellate counsel provided ineffective assistance since counsel failed to argue that the circuit court erred by refusing defendant's request to instruct the jury on involuntary manslaughter.

¶ 29    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-2 *et seq*. (West 2012)) provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated at trial or sentencing. *People v. Dupree*, 2018 IL 122307, ¶ 28. If the circuit court does not dismiss the petition as frivolous or patently without merit, it advances to the second stage. *People v. Domagala*, 2013 IL 113688, ¶¶ 32-33. At the second stage, the circuit court may appoint counsel to represent the defendant and the State may file a motion to dismiss or an answer to the petition. *Domagala*, 2013 IL 113688, ¶ 33.The defendant bears the burden of

making a substantial showing of a constitutional violation. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 30        At the second stage, the circuit court examines a postconviction petition to determine its legal sufficiency and any allegations not affirmatively refuted by the record must be taken as true. *Dupree*, 2018 IL 122307, ¶ 29. "[T]he 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." (Emphasis in original.) *Domagala*, 2013 IL 113688, ¶ 35. We review *de novo* the circuit court's dismissal of a postconviction petition at the second stage. *Dupree*, 2018 IL 122307, ¶ 29.

¶ 31        Claims of ineffective assistance of appellate counsel are measured under the standard set for in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Coleman*, 168 Ill. 2d 509, 523, (1995). A defendant must show that the failure of appellate counsel to raise an issue on direct appeal was objectively unreasonable and that the decision prejudiced defendant. *People v. Childress*, 191 Ill. 2d 168, 175 (2000). To show prejudice, the defendant must show that the underlying issue had merit. *Id*.

¶ 32        "In deciding whether to provide an instruction on the lesser offense, the court 'must examine the evidence presented and determine whether the evidence would permit a jury to *rationally* find the defendant guilty of the lesser-included offense, but acquit the defendant of the greater offense.' " (Emphasis added.) *People v. Manning*, 2020 IL App (2d) 180042, ¶ 13 (quoting *People v. Ceja*, 204 Ill. 2d 332, 360 (2003)). "Conversely, where the evidence shows that a defendant is either guilty of the greater offense or not guilty of any offense, no additional instruction is necessary." *Manning*, 2020 IL App (2d) 180042, ¶ 13. As for the amount of

evidence that is required for a circuit court to give a jury instruction on a lesser-included offense, the defendant is entitled to the instruction if there is *some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense, not whether there is *some credible* evidence. (Emphasis in original.) *People v. McDonald*, 2016 IL 118882, ¶ 23, 25.

¶ 33     We review the circuit court's decision whether to instruct the jury on a lesser-included offense for an abuse of discretion. *McDonald*, 2016 IL 118882, ¶ 42. An abuse of discretion occurs when the circuit court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *Id*. ¶ 32.

¶ 34     "Involuntary manslaughter is a lesser-included offense of first degree murder." *People v. Elizondo*, 2021 IL App (1st) 161699, ¶ 70. The difference between involuntary manslaughter and first degree murder is the mental state accompanying the conduct resulting in the victim's death. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). A person commits first degree murder where they act intentionally or they know that their acts create a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (2) (West 2004). "A person *** acts intentionally *** when his conscious objective or purpose is to accomplish that result or engage in that conduct." *Id.* § 4-4. A person commits involuntary manslaughter where they recklessly perform acts that are likely to cause death or great bodily harm to an individual. *Id.* § 9-3(a). "A person is reckless or acts recklessly when that person consciously disregards a substantial and *unjustifiable* risk that circumstances exist or that a result will follow, *** and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." (Emphasis added.) *Id.* § 4-6.

¶ 35     Defendant argues that his testimony at trial established that acted recklessly by grabbing a loaded, cocked firearm during a heated argument with Juliette in a small space with two

children in the room. The State argues that defendant fails to include that he also testified that Juliette reached for the firearm first, but he grabbed it before her because he saw that it was cocked. The State cites *People v. Castillo*, 188 Ill. 2d 536 (1999), to argue that defendant's complete testimony establishes that he acted with regard to a *justifiable* risk of harming Juliette in order to protect himself. See *id.* at 541.

¶ 36　　Defendant testified that he grabbed the firearm because Juliette reached for it first and he noticed that it was cocked. Juliette then jumped up from the bed and pushed his hand which caused the firearm to discharge. Similar to *Castillo*, defendant's testimony establishes that his acts were not reckless because they were justified. *Castillo*, 188 Ill. 2d at 541 ("[t]his testimony, however, was not evidence of recklessness, but was instead some evidence that defendant acted with regard to a *justifiable* risk of injuring the victim in order to protect himself"). Additionally, according to defendant, Juliette's actions, not his, discharged the firearm. Thus, if the jury believed defendant's testimony, then he would have been acquitted since none of his actions caused the firearm to discharge.

¶ 37　　In his reply brief, defendant raises the argument that the State's evidence at trial also established recklessness. He cites *People v. Roberts*, 265 Ill. App 3d 400 (1st Dist. 1994) and *People v. Castillo*, 188 Ill. 2d 536 (1994), to claim that the jury was not restricted to accepting either his testimony or the State's evidence, but rather could consider and exclude parts of both. See *Roberts*, 265 Ill. App 3d at 403-04; see *Castillo*, 188 Ill. 2d at 541-42. Specifically, defendant claims that Thomas and Dionne's testimony established that defendant recklessly brought the firearm to Juliette's bedroom and waved it around prior to the shooting. Additionally, Juliette told defendant to "put the gun away" in the tape recording. Defendant

concludes that the jury could have determined that he brought the firearm to Juliette's room but that the State did not prove that he intentionally fired it.

¶ 38     In making this argument, defendant asks the jury to ignore a large portion of the State's evidence and his testimony while accepting only the portions of each that indicate he brought the firearm to Juliette's room, and it accidentally went off. We reiterate that the standard for determining whether to instruct the jury on a lesser-included offense is whether there is *some evidence* in the record that, if believed by the jury, would permit a jury to *rationally* find the defendant guilty of the lesser-included offense, but acquit the defendant of the greater offense. (Emphasis added.) *Manning*, 2020 IL App (2d) 180042, ¶ 13-14.

¶ 39     Here, Dionne did testify that when she came downstairs, she saw defendant waving a firearm around. However, Dionne also testified that defendant told her that he planned to kill someone, defendant ordered her to tie Thomas up, defendant fired at Juliette a total of six times, and Juliette was outside the bedroom and running away when defendant starting shooting at her. Similarly, Thomas did testify that defendant pulled out a firearm. Still, Thomas also testified that defendant ordered Dionne to tie him up, defendant fired two shots from the bedroom doorway after Juliette ran out of the bedroom, and he heard a third gunshot. In the tape recording, Juliette did tell defendant to "put the gun away," but defendant also told Dionne to tie up Thomas and stated, "I'm fitting to kill a motherf***er in this house today."

¶ 40     The evidence presented at trial would not allow a jury to *rationally* find defendant guilty of manslaughter but acquit him of first degree murder. The State's evidence, if believed by the jury, indicated that either defendant intended to kill Juliette, or knew his actions created a strong probability of her death. 720 ILCS 5/9-1(a)(1), (2) (West 2004). Alternatively, if the jury believed defendant's testimony, then they would have acquitted him. *Supra*, ¶ 36; *Manning*,

2020 IL App (2d) 180042 (if evidence shows that a defendant is either guilty of the greater offense or not guilty of any offense, no additional instruction is necessary). It is the responsibility of the jury to assess the credibility of the witnesses, determine the appropriate weight of the testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the testimony. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A *rational* jury would not concoct a conviction of involuntary manslaughter based on the evidence in this case because doing so would require it to permit inconsistencies and conflicts in the evidence and draw unreasonable inferences from the testimony.

¶ 41    Since defendant's claim lacks merit, appellate counsel did not provide ineffective assistance by failing to argue on direct appeal that the circuit court erred by refusing defendant's request to instruct the jury on involuntary manslaughter. *Childress*, 191 Ill. 2d at 175 ("[u]nless the underlying issue is meritorious, [defendant] suffered no prejudice from counsel's failure to raise it on direct appeal"). Accordingly, defendant failed to make a substantial showing of a constitutional deprivation that would warrant advancing his postconviction petition to a third-stage evidentiary hearing. *Edwards*, 197 Ill. 2d at 246 (the postconviction petition advances to an evidentiary hearing if defendant makes a substantial showing of a constitutional violation, but it is dismissed if it fails to make a substantial showing).

¶ 42                    B. *De Novo* and Harmless Error

¶ 43    In the alternative, defendant argues that his case should be remanded for a third-stage evidentiary hearing where the State did not move to dismiss his claim concerning involuntary manslaughter instructions and the circuit court failed to review it properly. The State argues that we can affirm the decision of the circuit court on any grounds substantiated by the record, regardless of the circuit court's reasoning, and that we review *de novo* the circuit court's

dismissal of a postconviction petition at the second stage. Defendant then concedes that we could affirm the circuit court's dismissal of his claim as harmless error even if his claim lacked merit. Defendant then argues that his claim is not meritless and refers us to his initial argument.

¶ 44 While both parties agree that we can affirm the dismissal of defendant's postconviction petition if his claim lacked merit, they disagree about how we can affirm the dismissal. Under either approach, we would ultimately determine whether defendant's claim has merit. *People v. Pingelton*, 2022 IL 127680, ¶ 46, 52 (applying harmless error analysis to the second-stage dismissal of a postconviction petition and determining whether defendant made a substantial showing); *Dupree*, 2018 IL 122307, ¶ 29 (we review *de novo* the circuit court's second-stage dismissal of a postconviction petition and determine whether defendant's postconviction petition made a substantial showing); *People v. Demitro*, 406 Ill. App. 3d 954, 956 (a reviewing court may affirm the second-stage dismissal of a postconviction petition on any grounds substantiated by the record, regardless of the circuit court's reasoning); *Muhammad v. Abott Laoratories, Inc.*, 2022 IL App (1st) 210478, ¶ 22 (*de novo* review means that the reviewing court considers the motion anew and performs the same analysis that a circuit court would); *Door Properties, LLC v. Nahlawi*, 2020 IL App (1st) 173163, ¶ 25 (under *de novo* review, a reviewing court sits in the same position as the circuit court, owing no deference to any of its findings).

¶ 45 Accordingly, in the interest of judicial economy (*People v. Bailey*, 2017 IL 121450, ¶ 42) and since both parties agree that we can affirm the circuit court's dismissal if we determined that defendant's claim lacked merit, we find no reason to remand this case to the circuit court for further proceedings since we determined that defendant's claim lacked merit. *Supra*, ¶ 41.

¶ 46 CONCLUSION

¶ 47    For the reasons stated above, we affirm the circuit court's second-stage dismissal of defendant's postconviction petition.

¶ 48    Affirmed.